# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

CHRISTOPHER GARTH WILLIAMS,

    *Petitioner*,

vs.

JAMES SCHOMIG, *et al.*,

    *Respondents*.

2:03-cv-00298-RCJ-RJJ

ORDER

This habeas matter under 28 U.S.C. § 2254 comes before the Court for decision on the merits on the remaining claims.  Petitioner Christopher Garth Williams seeks to set aside his 1998 Nevada state court conviction, pursuant to a jury verdict, for first degree murder with the use of a deadly weapon.  The charge arose out of Williams' active participation with Robert Byford in the unprovoked shooting death of Monica Wilkins in the desert outside of Las Vegas, Nevada.  Williams was sentenced to death after a first trial, but the conviction and sentence were overturned.  He was sentenced after a second trial to two consecutive life sentences without benefit of parole.  Grounds 4, 5, 8, and 11 were dismissed previously.

### Background

Williams and Byford were tried together again in the second trial.  The Nevada Supreme Court summarized the evidence from the joint second trial in its published decision on Byford's direct appeal in *Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000).  The state high court's summary in *Byford* accurately summarizes evidence that was presented in the guilt phase in the joint trial, including the following:

> Byford, Williams, and two teenage girls were visiting [Todd]
> Smith at his parents' residence in Las Vegas on March 8, 1991.

Byford was twenty years old, Williams seventeen, and Smith nineteen.  Monica Wilkins, who was eighteen, called and told Smith she would pay him for a ride home from a local casino. Smith drove his jeep to pick Wilkins up, accompanied by Williams and one of the girls.  After Smith picked up Wilkins and her friend, Jennifer Green, he asked Wilkins for gas money.  Wilkins had Smith stop at a Burger King so that she could get some money. Williams went inside the store to see what was taking her so long, and Wilkins told him that she had gotten another ride.  Smith and Williams were upset with Wilkins, and after they drove away, Williams fired a handgun out the window of the jeep.

Smith testified that Wilkins had angered him, Williams, and Byford before because she had invited them to her apartment to party but then left with other men.  Byford and Williams had talked about "get[ting] rid of her" because she was always "playing games with our heads."  Smith participated in the talk but took the threats as jokes.

Later that night, Smith, Williams, and Byford were together at Smith's house when Wilkins called again for a ride home. Accompanied by Byford and Williams, Smith drove to pick her up. Smith then drove all four of them to the desert outside of town to find a party that Byford heard was taking place.  Wilkins told the other three that she had taken LSD earlier and was hallucinating. Smith drove to the usual area for parties, but they found no party. They then stopped so that everyone could urinate.   Wilkins walked up a ravine to do so.

Smith testified to the following.  As Wilkins finished, Byford handed Williams a handgun and said he "couldn't do it."  Smith asked Byford what he was doing with the gun, and Byford told Smith to "stay out of it."  Williams then shot Wilkins in the back three to five times.  She screamed and fell to the ground.  Wilkins got up, walked to Williams, and asked him why he had shot her. He told her that he had only shot around her.  Wilkins walked up out of the ravine but then felt the back of her neck, saw that she was bleeding, and again confronted Williams.  Williams told her that he shot her because she was "a bitch."  He then walked behind her and shot her again repeatedly.  Wilkins screamed and fell to the ground again.  Byford then took the gun from Williams, said that he would "make sure the bitch is dead," and fired two shots into her head.  Byford then got a can of gasoline from the jeep and poured it on Wilkins.  Byford tried to hand a lighter to Smith and get him to light the gasoline, but Smith refused.  Byford called him a "wussie" and lit the body.  As it burned, the three drove off.  As they returned to Las Vegas, Byford pointed the handgun at Smith and threatened to kill him if he ever told anyone.

Smith further testified that about a week after the murder, Byford and Williams had him drive them back to the desert to bury the body.  An inmate who was incarcerated in jail with Byford and Williams after their arrest also testified that the two told him about this trip back to the body.  They told the inmate that the

-2-

body was decomposing and had maggots on it. Byford and Williams rolled the corpse into the ravine and partly covered it with a few shovelfuls of dirt.

After about two more weeks, the body was discovered by target shooters. Las Vegas Metropolitan Police Department investigators collected sixteen .25 caliber shell casings at the site; ballistic testing showed that all were fired from the same weapon. Ten .25 caliber bullets were recovered; five were in the body. Three bullets were in the chest and abdomen, and two were in the head. Either of the bullets in the head would have been fatal. The body was partly eaten by coyotes or wild dogs. Other bullets could have been lost from the body due to this eating or the burning and decomposition of the body. The burning appeared to be postmortem.

In mid-April 1991, Byford's friend, Billy Simpson . . . and his brother Chad observed Byford and Williams engage in "play acting" in which Williams acted as if he shot Byford with a gun, Byford fell and then stood back up, and Williams opened his eyes wide and pretended to reload and shoot him again. Byford and Williams explained that they had shot and killed Wilkins in the desert and then burned her body.

. . . . .

Neither Byford nor Williams testified. However, Williams introduced, over Byford's objection, Byford's testimony from the first trial. The gist of that prior testimony was that Smith and Wilkins were boyfriend and girlfriend, that they argued that night, that Smith shot Wilkins, and that Byford and Williams only aided Smith in concealing the crime. . . . .

*Byford v. State*, 116 Nev. at 221-23, 994 P.2d at 705-06.[1]

After the murder, Williams participated in conversations in which he and/or Byford made directly inculpatory statements, in addition to the statements to Billy Simpson and Chad Simpson referenced above.

Robyn Jackman testified as follows. In the late spring or summer of 1991, she and Melanie Sullivan were at a park with Williams, Byford and the Simpson brothers. Byford said, in Williams' presence, that an undefined "they" had shot someone on "fry," which was slang for LSD. He said that they shot her, she got back up, they shot her again, and they then

---

[1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of the state court evidence. It quotes the Nevada Supreme Court summary and/or summarizes additional evidence solely as background to the issues presented in this case. No statement of fact made in describing testimony or other evidence constitutes a finding of fact by the Court.

1    burned her body.  Byford said that they were all on "fry" and they wanted to see what would

2    happen when they shot someone on LSD.  At the end of Byford's account, Williams added

3    that "[t]hey thought it was a trip when they – when she got back up and then she collapsed"

4    and that "[i]t scared them."[2]

5        Wayne Porretti testified as follows.  He was incarcerated with Williams and Byford in

6    Clark County Detention Center.  During a conversation between the three, Williams told

7    Porretti that he had shot a girl by the name of Monica Wilkins in the back.  Williams said that

8    he shot Wilkins in the back, that between the two of them "they emptied a couple clips," and

9    that finally Byford shot her in the back of the head.  Williams told Porretti that they shot

10   Wilkins "because she was a bitch."  In a subsequent conversation, Williams stated in

11   reference to the crime that murder should not be a capital offense, reflecting a belief that "he

12   didn't think it was a big deal."[3]

13       In another incident, while at a barbeque at Chad Simpson's grandmother's home,

14   Williams stuck a hand in hamburger meat and said to Simpson that "it looked like Monica's

15   brains."[4]

16       The evidence at trial further established that the two men would have had to reload the

17   .25 caliber semiautomatic used to kill Monica Wilkins at least twice over the course of the

18   murder.  In Byford's replayed testimony from the first trial, he testified that he and Williams

19   owned a .25 caliber Raven semiautomatic pistol and that the weapon had a six-round

20   magazine.  According to Byford, Todd Smith (rather than Williams and Byford) used this .25

21   caliber Raven semiautomatic to murder Monica Wilkins.  The forensic firearms examiner,

22   Robert Good, Sr., confirmed that the magazine for a .25 caliber Raven semiautomatic held

23   six rounds, such that the maximum capacity that the weapon could hold was seven rounds

24   _____

25       [2]#59, Ex. AA, at 200-210 & 222-23.  Melanie Sullivan testified that, during the conversation, she
     heard Byford, in Williams' presence, state that he and Williams had burned a girl in the desert. #70, Ex. 4, at
26   270-78 & 281-90.

27       [3]#59, Ex. AA, at 180-200.

28       [4]#59, Ex. AA, at 241.

1   if one round already was in the firing chamber.  No pre-market or after-market magazines
2   were available for the weapon -- or for any other .25 caliber semiautomatic handgun -- that
3   had more than a six-round capacity.  Consequently, firing a combined total of sixteen shots
4   with the weapon would require that Williams and Byford reload the weapon at least twice, as
5   it would require three loaded magazines to fire sixteen shots.[5]

6                              ***Governing Standard of Review***

7         The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly
8   deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 521 U.S. 320, 333
9   n. 7, 117 S.Ct. 2059, 2066 n.7,138 L.Ed.2d 481 (1997).  Under this deferential standard of
10  review, a federal court may not grant habeas relief merely on the basis that a state court
11  decision was incorrect or erroneous.  *E.g., Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir.
12  2003).  Instead, under 28 U.S.C. § 2254(d), the federal court may grant habeas relief only if
13  the decision: (1) was either contrary to or involved an unreasonable application of clearly
14  established federal law as determined by the United States Supreme Court; or (2) was based
15  on an unreasonable determination of the facts in light of the evidence presented at the state
16  court proceeding.  *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15, 124 S.Ct. 7, 10, 157 L.Ed.2d
17  263 (2003).

18        A state court decision is "contrary to" law clearly established by the Supreme Court only
19  if it applies a rule that contradicts the governing law set forth in Supreme Court case law or
20  if the decision confronts a set of facts that are materially indistinguishable from a Supreme
21  Court decision and nevertheless arrives at a different result.  *E.g., Mitchell,* 540 U.S. at 15-16,
22  124 S.Ct. at 10.  A state court decision is not contrary to established federal law merely
23  because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has
24  held that a state court need not even be aware of its precedents, so long as neither the
25  reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may
26  not overrule a state court for simply holding a view different from its own, when the precedent

27

28        [5]#59, Ex. DD, at 69, 72 & 91-93 (Byford); #70, Ex. 4, at 18-23 (Good).

1    from [the Supreme] Court is, at best, ambiguous." *Mitchell*, 540 U.S. at 17, 124 S.Ct. at  11.

2    For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme

3    Court precedent is not contrary to clearly established federal law.

4         A state district court decision constitutes an "unreasonable application" of clearly

5    established federal law only if it is demonstrated that the state court's application of Supreme

6    Court precedent to the facts of the case was not only incorrect but "objectively unreasonable."

7    *E.g., Mitchell*, 540 U.S. at 18,124 S.Ct. at 12; *Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir.

8    2003).

9         To the extent that the state court's factual findings are challenged intrinsically based

10   upon evidence in the state court record, the "unreasonable determination of fact" clause of

11   Section 2254(d)(2) controls on federal habeas review.  *E.g., Lambert v. Blodgett*, 393 F.3d

12   943, 972 (9th Cir. 2004).  This clause requires that the federal courts "must be particularly

13   deferential" to state court factual determinations.  *Id*.  The governing standard is not satisfied

14   by a showing merely that the state court finding was "clearly erroneous."  393 F.3d at 973.

15   Rather, the AEDPA requires substantially more deference:

16                 . . . . [I]n  concluding that a state-court finding is unsupported by
                  substantial evidence in the state-court record, it is not enough that
17                we would reverse in similar circumstances if this were an appeal
                  from a district court decision. Rather, we must be convinced that
18                an appellate panel, applying the normal standards of appellate
                  review, could not reasonably conclude that the finding is
19                supported by the record.

20   *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.  If

21   the state court factual findings withstand intrinsic review under this deferential standard, they

22   then are clothed in a presumption of correctness under 28 U.S.C. § 2254(e)(1); and they may

23   be overturned based on new evidence offered for the first time in federal court, if other

24   procedural prerequisites are met, only on clear and convincing proof.  393 F.3d at 972.

25        The petitioner bears the burden of proving by a preponderance of the evidence that

26   he is entitled to habeas relief.  *Davis*, 333 F.3d at 991.

27        / / / /

28

                                          -6-

***Discussion***

**Ground 1(a): Jury Instruction on Malice**

In Ground 1(a), petitioner contends that he was denied due process and equal protection in violation of the Fifth and Fourteenth Amendments because the jury instruction on malice impermissibly shifted the burden of proof by affording the prosecution a presumption of malice.

The disputed jury charge, Instruction No. 10, stated:

> Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof.
>
> Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.

#59, Ex. FF.

The Nevada Supreme Court rejected petitioner's claim on the following basis:

> . . . Williams . . . contends that the jury instruction on implied malice pursuant to NRS 200.020(2) creates an unconstitutional mandatory presumption. This court considered and rejected this contention in Doyle v. State, 112 Nev. 879, 900-02, 921 P.2d 901, 915-16 (1996).

#23, Ex. G, at 6.

In the above-cited *Doyle* decision, the Supreme Court of Nevada held:

> The jury was instructed regarding implied malice according to the statutory definition provided in NRS 200.020(1) and (2). Doyle contends that the instruction created a mandatory presumption in favor of the State and improperly shifted the burden of proof to the defendant.
>
> In *Ruland v. State*, 102 Nev. 529, 728 P.2d 818 (1986), this court expressly held that the above-mentioned jury instruction does not constitute an impermissible mandatory presumption. *See also Guy v. State*, 108 Nev. 770, 839 P.2d 578 (1992) (identical instruction held proper, although mandatory presumption issue not discussed). This court concluded that the instruction was constitutionally permissible because the instruction merely defines "implied malice" rather than directing the jury to find any presumed fact against the accused. *Ruland*, 102 Nev. at 533, 728 P.2d at 820-21.
>
> Doyle notes that the opposite conclusion was reached in *Fulghum v. Ford*, 850 F.2d 1529 (11th Cir.1988), *cert. denied*,

488 U.S. 1013, 109 S.Ct. 802, 102 L.Ed.2d 793 (1989), a case that involved statutory language identical to that contained in NRS 200.020. In *Fulghum*, the Eleventh Circuit Court of Appeal found that the implied malice instruction, standing alone, would have been constitutionally infirm. 850 F.2d at 1534 (citing *Lamb v. Jernigan*, 683 F.2d 1332 (11th Cir.1982), cert. denied, 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983)). However, the court concluded that any ambiguity regarding the State's burden of proving malice beyond a reasonable doubt was cured by the presence of a "strong" circumstantial evidence instruction. *Fulghum*, 850 F.2d at 1535 (citing *Lamb*); *see also Francis v. Franklin*, 471 U.S. 307, 318-19, 105 S.Ct. 1965, 1973-74, 85 L.Ed.2d 344 (1985) ("[T]he jury charge taken as a whole ... explained the proper allocation of burdens with sufficient clarity that any ambiguity in the particular language challenged could not have been understood by a reasonable juror as shifting the burden of persuasion.").

In *Fulghum*, the jury instructions provided: "To warrant a conviction upon circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." 850 F.2d at 1535. The jury instructions in the present case contained no such language. Jury Instruction No. 32, however, provided that "[t]he defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged." We believe that this court's reasoning in *Ruland* remains sound. We also believe that, taken as a whole, the jury instructions in this case were sufficient to cure any ambiguity that may have existed in the challenged jury instruction regarding the State's ultimate burden of proving malice beyond a reasonable doubt. Accordingly, we conclude that under either *Ruland* or *Fulghum*, the challenged instruction was not improper.

112 Nev. at 915-16, 921 P.2d at 901 (footnote with text of statute omitted).

In petitioner's case, Instruction No. 26, like the instruction referenced in *Doyle*, charged the jury that the defendants were "presumed innocent until the contrary is proved."[6]

Petitioner has not come forward with any apposite United States Supreme Court authority establishing that the decision of the Supreme Court of Nevada rejecting this claim either was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

/ / / /

---

[6]#59, Ex. FF.

1      Moreover, the Ninth Circuit has held that an error in an implied malice instruction is at

2  best harmless error when a defendant is convicted of first degree murder under Nevada law,

3  as it is impossible under Nevada law for the jury's decision to have rested on a theory of

4  implied malice if the jury finds the defendant guilty of first degree murder.  *See Ficklin v.*

5  *Hatcher*, 177 F.3d 1147, 1151-52 (9th Cir. 1999).[7]

6      Ground 1(a) therefore does not provide a basis for federal habeas relief.[8]

7      **_Ground 1(b): Jury Instruction on Willful, Deliberate and Premeditated Killing_**

8      In Ground 1(b), petitioner contends that he was denied due process and equal

9  protection in violation of the Fifth and Fourteenth Amendments because Instruction Numbers

10  11 and 12 on first degree murder failed to define, explain or clarify the words willful, deliberate

11  and premeditated.

12      Instruction No. 11, stated:

13          Murder of the First Degree is the willful, deliberate and
             premeditated killing of another human being.

14  #59, Ex. FF.

15      / / / /

16

17  _____

18  [7]In the present case, as in *Ficklin*, the jury was instructed that first degree murder "is the willful,
    deliberate and premeditated killing of another human being," such that the first degree murder verdict in this

19  case, as in *Ficklin*, precluded reliance upon an implied malice theory. #59, Ex. FF, Instruction No. 11.

20  [8]The United States Supreme Court cases relied upon by petitioner are not controlling on the facts
    presented.  In *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), the instructions in

21  question stated in pertinent part that "the acts of a person of sound mind and discretion are presumed to be
    the product of the person's will, but the presumption may be rebutted," and further that "[a] person of sound

22  mind and discretion is presumed to intend the natural and probable consequences of his acts but the
    presumption may be rebutted."  In *Yates v. Aiken*, 484 U.S. 211, 108 S.Ct. 534, 98 L.Ed.2d 546 (1988), the

23  instruction in question stated in pertinent part that "malice is implied or presumed from the use of a deadly
    weapon."  The charge in the present case did not contain the language found to offend the Constitution in

24  *Francis* and *Yates*.  *Francis* and *Yates* further are distinguished by the fact that, as recognized in *Ficklin*, it
    was not possible for Williams' conviction for first degree murder to be based upon the implied malice

25  instruction.  To the further extent that Williams relies upon the Eleventh Circuit's *Fulghum* decision -- to the
    extent, if any, that the decision is to the contrary -- the reliance is misplaced.  His burden under the AEDPA is

26  to establish that the decision of the Supreme Court of Nevada rejecting his claim was either contrary to or an
    unreasonable application of clearly established law *as determined by the United States Supreme Court*, not

27  by a federal court of appeals.  Moreover, it is not necessary that a state court decision cite, or even be aware,
    of the Supreme Court's opinions, so long as neither the reasoning nor the result of its decision contradicts

28  them. *E.g., Mitchell,* 540 U.S. at 15-16,124 S.Ct. at 10.

Instruction No. 12, stated:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

#59, Ex. FF.

The Supreme Court of Nevada rejected petitioner's claim on direct appeal on the following basis:

> Williams contends that the jury instruction on premeditation violated his rights to due process, equal protection, and a reliable sentence. This court recently concluded that this instruction ("the Kazalyn instruction") does not fully define "willful, deliberate, and premeditated." Byford v. State, 116 Nev. ___, 994 P.2d 700 (Adv. Op. No. 23, February 28, 2000). Therefore, when jurors are instructed separately on the meaning of premeditation, they should also be instructed on the meaning of deliberation. Id. In Byford, we provided jury instructions for future use; we did not conclude that giving the Kazalyn instruction without separately defining deliberation constituted error or required reversal. See id. And no relief is warranted here. The evidence is clearly sufficient to establish deliberation and premeditation on Williams's part. Williams and Byford had talked of "get[ting] rid" of the victim on prior occasions. On the night of the murder, Byford handed the gun to Williams, saying that he (Byford) "couldn't do it," and told Smith [another member of their party] to "stay out of it." Thus, it is evident that Williams and Byford discussed shooting the victim before doing so. Williams and Byford then calmly and dispassionately shot the victim in the absence of any provocation, confrontation, or stressful circumstance of any kind. Williams first shot her several times and then, after some time had passed, shot her several more times. When the victim was helpless on the ground, Williams then gave the gun over to Byford, who shot her in the head twice. The evidence was sufficient for the jurors to reasonably find that before acting to kill the victim, Williams weighed the reasons for and against his action, considered its consequences, distinctly formed a design to kill, and did not act simply from a rash, unconsidered impulse. See Briano v. State, 94 Nev. 422, 425, 582 P.2d 5, 7 (1978)(evidence of premeditation and deliberation is seldom direct, and circumstantial evidence may be taken into account to provide sufficient evidence).

#23, Ex. G, at 6-7.

-10-

1       The recent Ninth Circuit decision in *Polk v. Sandoval*, 503 F.3d 903 (9th Cir. 2007),

2   establishes that the Nevada Supreme Court's holding that use of the *Kazalyn* instruction did

3   not violate due process was contrary to clearly established federal law as determined by the

4   United States Supreme Court.  503 F.3d at 909-11.  Under the binding circuit precedent in

5   *Polk*, Williams' "federal constitutional right to due process was violated by the use of the

6   *Kazalyn* instruction because it relieved the State of its burden of proving every element of first

7   degree murder beyond a reasonable doubt."  503 F.3d at 909.

8       The presence of a due process violation does not end the Court's inquiry, however.

9   As explained in *Polk*, the Court further must determine whether the constitutional error was

10  harmless error.  Williams will be entitled to relief only if "'the error had a substantial and

11  injurious effect or influence in determining the jury's verdict.'"  *Polk*, 503 F.3d at 911 (quoting

12  *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).

13      The Court holds that the jury charge error was harmless error given the exceptionally

14  strong evidence of deliberation on Williams' part in the wholly unprovoked and merciless

15  killing of Monica Wilkins.  The jury was presented with strong evidence that Williams, in

16  concert with Byford, weighed the reasons for and against killing Wilkins, considered the

17  consequences, distinctly formed the design to kill her, and acted in a cold and deliberate

18  fashion rather than simply from a rash or unconsidered impulse.  Williams and Byford

19  previously had talked of "getting rid" of Monica Wilkins.  At the time of the murder itself, when

20  Byford handed the gun initially to Williams, Byford stated that he "couldn't do it," and he told

21  Todd Smith to "stay out of it."  The evidence strongly supported the inference that the "it" that

22  Byford could not do initially, and that Smith was to stay out of, was the previously discussed

23  murder of Monica Wilkins.  Williams then shot Wilkins three to five times from behind, calmly,

24  dispassionately and without any provocation, confrontation, or inciting event.  Then, after

25  briefly conversing twice with Wilkins and then telling her that he had shot her because she

26  was "a bitch," Williams once again walked up behind her and shot her again repeatedly.

27      A total of sixteen .25 caliber shell casings and ten .25 caliber bullets were recovered

28  later.  Five of the rounds were recovered from within Wilkins' body, and additional bullets may

1    have been lost from inside the body due to the burning and decomposition of her body as well

2    as due to animals feeding on her body.  The evidence accordingly tended to establish that

3    Williams fired at least eight and perhaps as many as fourteen shots at or into Wilkins, in

4    addition to the shots fired at the end by Byford.  Indeed, by Williams' own inculpatory

5    admission subsequent to the murder, he and Byford "emptied a couple of clips" while shooting

6    Wilkins.  The forensic firearm evidence confirmed that the men would have had to stop and

7    reload the weapon twice to fire sixteen shots in the course of murdering Wilkins.  The

8    evidence reflected that Williams fired the second set of shots after seeing that he had hit

9    Wilkins with the first set of shots, after talking with her about the fact that he had shot her,

10   after telling her why he had shot her, and, finally, after walking up behind her in order to begin

11   shooting her again.

12        Such evidence strongly supported, if not virtually compelled, a jury finding that

13   Williams' actions were deliberate as well as premeditated and wilful.  The jury charge error

14   therefore could not have had a substantial and injurious effect or influence in determining the

15   jury's verdict.  The error accordingly was harmless error under the governing *Brecht* harmless

16   error standard.

17        Ground 1(b) therefore does not provide a basis for federal habeas relief.[9]

18        / / / /

19

20        [9]Although *Polk* was decided after this matter was submitted, petitioner has relied upon the decision

21   herein.  #65.  The Court is not persuaded by the petitioner's argument that *Polk* has res judicata or collateral
     estoppel effect as against the respondents on the harmless error issue in this case, given the entirely

22   different set of facts.

23        The Court notes that the *Polk* panel contrasted the facts in *Polk* with the Nevada Supreme Court's
     description, in its published *Byford* decision, of the facts in the present case as to Williams' co-defendant

24   Byford.  The *Polk* panel contrasted the more compelling facts showing deliberation by Byford with the facts in
     *Polk* in holding that the far less compelling facts in *Polk* did not support a finding of harmless error.  *See* 503

25   F.3d at 912.  The discussion in *Polk* of the facts from this case of course did not constitute a holding by the
     Ninth Circuit regarding the application of the harmless error standard to the facts of this case.  Moreover, the

26   discussion from *Byford* was directed to the culpability of Byford, who shot Wilkins twice, saying that he "would
     make sure she was dead," after Williams first had fired eight or more shots at or into her.  However, the fact

27   that the Ninth Circuit distinguished the factual scenario in the present case from the less compelling facts
     presented in *Polk* provides additional indirect support for the Court's conclusion herein, which has been

28   reached following a *de novo* consideration of the application of the *Brecht* standard to Williams' own actions.

***Ground 1(c): Jury Instruction on Sympathy in Penalty Phase***

In Ground 1(c), Williams alleges that he was denied, *inter alia*, due process because Penalty Phase Instruction No. 20 stated that the jury "may never be influenced by sympathy."

The disputed penalty phase jury charge, Instruction No. 20, stated, in pertinent part:

> A verdict may never be influenced by sympathy, prejudice or public opinion. Your decision should be the product of sincere judgment and sound discretion in accordance with these rules of law.

#59, Ex. GG.

The state high court rejected the challenge to this charge on the following basis:

> Williams claims that in the penalty phase an "antisympathy instruction undermined his right to have the jury consider all mitigating evidence. This claim lacks merit. See Wesley v. State, 112 Nev. 503, 519, 916 P.2d 793, 803-04 (1996).

#23, Ex. G, at 7.

In the above-cited *Wesley* decision, the Supreme Court of Nevada held:

> Over Wesley's objection, the district court instructed the jury that "[a] verdict may never be influenced by sympathy, prejudice or public opinion. Your decision should be the product of sincere judgment and sound discretion in accordance with the rules of law." Wesley contends that the district court's instruction violated his right to present, and to have the jury consider, any relevant mitigating evidence regarding his character, record, and the circumstances of the offense. A district court may instruct the jury not to consider sympathy during a capital penalty hearing, as long as the court also instructs the jury to consider mitigating factors. [*Lay v. State*, 110 Nev. 1089, 1195, 886 P.2d 448, 451-52 (1994)]. In the present case, the district court instructed the jury to "consider any aspect of the defendant's character or record and any of the circumstances of the offense that the defense proffers as a basis for a sentence less than death." Accordingly, we conclude that the district court's antisympathy instruction was proper. *Id.; accord Saffle v. Parks*, 494 U.S. 484, 492-93, 110 S.Ct. 1257, 1262-63, 108 L.Ed.2d 415 (1990).

112 Nev. at 519, 916 P.2d at 803-04.

In Williams' case, Penalty Phase Instruction No. 9, as in *Wesley*, instructed the jury, in considering mitigating circumstances, to "consider any aspect of the Defendants['] character or record and any of the circumstances of the offense that the Defendants proffer as a basis for a sentence less than death."  #59, Ex. GG.

1   In *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001), the Ninth Circuit, sitting *en banc*,

2   held that the core argument presented by Williams on Ground 1(c) – that a penalty phase

3   instruction to not  be influenced by sympathy violates the federal constitution – did not even

4   warrant a certificate of appealability (COA).  The Ninth Circuit stated:

6           The Supreme Court has admonished that state jury
    instructions must be upheld against constitutional attack unless
7   "there is a reasonable likelihood that the jury has applied the
    challenged instruction in a way that prevents the consideration of
    constitutionally relevant evidence." *Boyde v. California*, 494 U.S.
8   370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).  At the penalty
    phase of a capital trial, this directive requires that "the sentencer
9   ... be able to consider and give effect to mitigating evidence in
    imposing the sentence, so that the sentence imposed reflects a
10  reasoned moral response to the defendant's background,
    character, and crime." *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct.
11  1910, 1916, 150 L.Ed.2d 9 (2001)(quotations and citations
    omitted).

13          Applying these standards, federal courts have consistently
    held that jury instructions admonishing the jury to base its penalty
14  determination on mitigating or aggravating evidence, not on
    sympathy for the defendant, pass constitutional muster.  *See,
    e.g., Victor v. Nebraska*, 511 U.S. 1, 13, 114 S.Ct. 1239, 127
15  L.Ed.2d 583 (1994)(holding that an instruction not to be swayed
    by mere sympathy correctly pointed the jurors' attention to the
16  evidence before them); *Johnson v. Texas*, 509 U.S. 350, 371-72,
    113 S.Ct. 2658, 125 L.Ed.2d 290 (1993)(holding that the
17  constitution does not require that a capital jury be able to
    dispense mercy solely on the basis of a "sympathetic response to
18  the defendant"); *California v. Brown*, 479 U.S. 538, 542-43, 107
    S.Ct. 837, 93 L.Ed.2d 934 (1987)(permitting an instruction that
19  the jury could not base its sentencing decision on sympathy);
    *Williams v. Calderon*, 52 F.3d 1465, 1481 (9th Cir.1995)
20  (observing that " 'no sympathy' instructions have been held by the
    Supreme Court to be consistent with its mandate ... that the
21  sentencer be permitted to consider all mitigating evidence")
    (citations omitted).  In light of this precedent, no reasonable jurist
22  could debate or find wrong the district court's denial of Mayfield's
    request for habeas corpus relief on this claim. We decline to grant
23  a COA with regard to this issue.

24  270 F.3d at 923.  As this Court stated earlier, petitioner may not rely upon circuit authority to

25  establish that a Nevada Supreme Court decision is contrary to or an unreasonable application

26  of clearly established federal law as determined by the United States Supreme Court.

27  However, when an *en banc* decision of the Ninth Circuit not only rejects the petitioner's

28  position but further denies a COA, on the basis that reasonable jurists would not find the point

1  debatable, petitioner clearly cannot carry his burden under the AEDPA.  *Mayfield* is binding

2  circuit precedent that must be followed by this Court, and the decision compels the denial of

3  petitioner's claim.  Ground 1(c) does not provide a basis for federal habeas relief.[10]

4       ***Ground 2: Alleged Ineffective Assistance – Connie Hillman Statement***

5       In Ground 2, petitioner alleges that he was denied effective assistance of counsel when

6  trial counsel failed to object to the admissibility of the prosecutor's reading of a transcribed

7  statement by Connie Hillman during the penalty phase and when appellate counsel failed to

8  raise a claim of error in this regard on direct appeal.  He maintains that counsel should have

9  objected to the admissibility of the statement on the grounds that the statement was

10 irrelevant, that the admission of the statement violated the Confrontation Clause, that it was

11 not made for evidentiary purposes for the use of police, that the transcription process and its

12 interpretation of Hillman's slang were not reliable, and that admission of references to drug

13 activity violated Nevada's prohibition on admission of other bad acts evidence.

14      During the penalty phase, Julie Slabaugh, a state deputy attorney general, testified

15 regarding an effort by Williams and three other individuals, including Connie Hillman, to have

16 methamphetamine smuggled to Williams while in custody in late 1996.  As part of Slabaugh's

17 testimony, a transcript of a telephone conversation between Williams and Hillman was read

18 to the jury.  Hillman and an accomplice were intercepted on their way in to the institution with

19 seventeen grams of methamphetamine, and Hillman was convicted on drug charges.[11]

20      On state post-conviction review, Williams presented a claim through appointed counsel

21 that trial and appellate counsel had been ineffective for failing to challenge the admission of

22

23       [10]The two Supreme Court cases cited by Williams both precede *Mayfield* and therefore cannot
    provide a basis for departing from the *en banc* decision.  This Court could depart from binding circuit

24  precedent only on the basis of an intervening Supreme Court decision.  The Supreme Court cases in any
    event do not support Williams' position.  The *Mayfield en banc* court expressly cites the Supreme decision in

25  *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), for exactly the opposite proposition
    that Williams advances.  He further relies upon *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d

26  415 (1990).  In *Saffle v. Parks*, however, the Court held that a rule against antisympathy penalty phase
    instructions could *not* be adopted for the first time on habeas review and that any such new rule "would

27  contravene well-considered precedents."  494 U.S. at 486, 110 S.Ct. at 1259.  Ground 1(c) is frivolous.

28       [11]#59, Ex. EE, at 125-152.

-15-

1    the transcribed statement under the Confrontation Clause.  Petitioner did not present a claim

2    that counsel had been ineffective for failing to challenge introduction of the statement on any

3    other ground.  Petitioner in particular did not present a claim that counsel had been ineffective

4    for failing to raise challenges on grounds of relevancy, lack of police evidentiary purpose,

5    unreliability of the transcription, or violation of the rule regarding bad acts evidence.[12]

6              The Supreme Court of Nevada rejected the claim that counsel had been ineffective for

7    failing to raise a Confrontation Clause challenge, on the following grounds:

8

9                   . . . Williams contended that trial and appellate counsel
     were ineffective in failing to challenge the admissibility of Connie
10    Hillman's statement as violating the Confrontation Clause of the
     United States Constitution.  The recorded telephone conversation
11    between Williams and Hillman was read to the jury at the penalty
     phase.  In that conversation, Williams and Hillman discussed a
12    plan where Hillman would smuggle methamphetamine into the
     prison and pass it to Williams.  Williams alleged that the reading
13    of Hillman's statement violated the Confrontation Clause because
     Hillman was not a witness at the penalty hearing.  We conclude
14    that the district court did not err in rejecting Williams' allegation.

15                   In Wade v. State, this court held that the admission of
     taped conversations between a charged defendant and a police
16    informant did not violate the Confrontation Clause of the United
     States Constitution.  In so holding, this court reasoned that the
17    informant's statements were nonhearsay because they were not
     admitted to prove the truth of the matter asserted, "but only for
18    the limited purpose of providing a context for [the defendant's]
     statements."  Like the recorded informant's statements in Wade,
19    Hillman's statements were admitted merely to provide a context
     for Williams' statements about the conspiracy, not for their truth.
20    Therefore, Williams' right to confront the witnesses against him
     was not violated by the admission of Hillman's statement because
21    her statement was not admitted for its truth.  Accordingly, counsel
     were not ineffective for failing to challenge the admissibility of
22    Hillman's statement as violating the Confrontation Clause
     because that challenge would have been unsuccessful.

23    #23, Ex. T, at 6-7 (footnote with further background detail and citation footnotes omitted).

24              The Nevada Supreme Court's rejection of the ineffective assistance claim based upon

25    a failure to raise a Confrontation Clause challenge was neither contrary to nor an

26    unreasonable application of clearly established federal law.

27    _____

28         [12]#23, Ex. N, at 19-23.

On a claim for ineffective assistance of counsel, the petitioner must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance resulted in actual prejudice.  On the performance prong, the question is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from counsel's perspective at the time. In this regard, the reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct.  On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

Petitioner contends in the reply that a Confrontation Clause challenge would have been successful if trial and appellate counsel had relied upon *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

*Crawford*, however, was not decided until 2004, long after petitioner's 1998 trial and after the 2002 decision on his direct appeal.  Because an attorney's performance must be assessed from the lawyer's perspective at the time, it is established law that an attorney is not ineffective for failing to anticipate a decision in a later case.  *See,e.g., Murtishaw v. Woodford*, 255 F.3d 926, 950 (9th Cir. 2001); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994); *United States v. Zweber*, 913 F.3d 705, 712 (9th Cir. 1990).  Trial counsel's performance was not deficient in 1998 and appellate counsel's performance was not deficient up through 2002 for failing to anticipate the 2004 *Crawford* decision, especially given that *Crawford* overruled prior governing Supreme Court authority to the contrary.  Moreover, *Crawford* in all events is not even retroactively applicable to Williams' case, as his conviction became final prior to *Crawford*.  *See Whorton v. Bockting*, ___ U.S. ___, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007).  *Crawford* therefore is of no assistance to Williams on collateral review of his conviction.

/ / / /

-17-

1    Williams further has not established that there was a reasonable probability that

2   reliance upon a Confrontation Clause argument based upon *Ohio v. Roberts* would have

3   produced a different outcome either at trial or on appeal.  Under the Supreme Court case law

4   following *Ohio v. Roberts*, the Confrontation Clause did not bar the use of testimonial

5   statements for purposes other than establishing the truth of the matter asserted.  *See,e.g.,*

6   *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985).  The

7   Nevada Supreme Court's conclusion that a Confrontation Clause objection to the Hillman

8   statements would have been unsuccessful, on the basis that her statements were not offered

9   for the truth of the matter asserted but instead to establish the context for Williams' own

10  statements, was neither contrary to nor an unreasonable application of such clearly

11  established federal law, including *Ohio v. Roberts*.[13]

12   The remaining allegations of Ground 2 do not appear to have been exhausted.

13  Petitioner did not present a claim to the state courts that counsel had been ineffective for

14  failing to raise challenges on grounds of relevancy, lack of police evidentiary purpose,

15  unreliability of the transcription, or violation of the rule regarding bad acts evidence.  The only

16  reference to reliability was within the context of the Confrontation Clause argument.

17   The Court nonetheless, particularly given the age of this case, will review the

18  unexhausted portions of Ground 2 on the merits under 28 U.S.C. § 2254(b)(2), on *de novo*

19  review.

20   There was not a reasonable probability that a challenge based upon any of these

21  additional grounds would have been successful, given that the evidence was introduced in

22  the penalty phase rather than in the guilt phase.

23   There was not a reasonable probability that a relevancy objection would have been

24  successful.  In the penalty phase, under N.R.S. 175.522(3), "evidence may be presented

25  _____

26   [13]Hillman's statements further potentially also could have been admissible under the hearsay
   exception in N.R.S. 51.035(3)(e) for a statement made "by a coconspirator of a party during the course and in
27  furtherance of the conspiracy," to wit, the conspiracy to smuggle methamphetamine into the institution.  In
   general, statements admissible under a firmly established hearsay exception were admissible over a
28  Confrontation Clause objection under the rule in force under *Ohio v. Roberts*.

concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible."  Evidence of a defendant's character, record, and specific instances of conduct are relevant to the jury's determination of the appropriate sentence for a capital crime, where the danger of unfair prejudice does not substantially outweigh probative value.  *E.g., McKenna v. State*, 114 Nev. 1044, 1051-52, 968 P.2d 739, 744 (1998).  The decision to admit particular character evidence during the penalty phase lies within the sound discretion of the district court and will not be disturbed absent an abuse of discretion.  *Id.*  Testimony regarding other uncharged crimes is admissible at a capital penalty hearing so long as the evidence is not impalpable or highly suspect.  *E.g., Leonard v. State*, 114 Nev. 1196, 1213-14, 969 P.2d 288, 299 (1998).  Accordingly, evidence of a capital murder defendant's involvement in drug offenses properly may be admitted during the penalty phase as character evidence even where he has not been charged.  *E.g., Robins v. State*, 106 Nev. 611, 625-26, 798 P.2d 558, 567-68 (1990).  Given these authorities, trial and appellate counsel did not provide deficient performance by failing to pursue a relevancy objection, and petitioner was not prejudiced by a failure to pursue such a challenge.

Petitioner has not come forward with any supporting facts or apposite authority establishing a reasonable probability that objections based upon a lack of police evidentiary purpose or unreliability of the transcription would have been successful.  Petitioner makes a wholly conclusory allegation that trial and appellate counsel were ineffective because they failed to challenge the "transcription process and its interpretation of [Hillman's] slang."  In reviewing the state court record presented, there is nothing in the record at all suggesting any unreliability either of the transcription or regarding interpretation, if any, of the slang in the telephone conversation.

With regard to a possible objection based upon the evidence violating Nevada's prohibition on admission of other bad acts evidence, the evidence, again, was introduced during the penalty phase, not the guilt phase.  Under the previously cited authorities, evidence of petitioner's other bad acts, including uncharged drug offenses, was admissible in the

1   penalty phase with regard to his character.  Petitioner cites no apposite authority holding that

2   N.R.S. 48.045 barred the admission of such evidence in the penalty phase.

3         Accordingly, the Court concludes, on *de novo* review, that trial and appellate counsel

4   did not render deficient performance in failing to challenge the statements on the new

5   additional grounds advanced by petitioner for the first time on federal habeas review, and

6   petitioner was not prejudiced by any such failure.

7         Ground 2 therefore does not provide a basis for federal habeas relief.

8   ***Ground 3:  Alleged Ineffective Assistance – Prosecutorial Misconduct***

9         In Ground 3, petitioner alleges that he was denied effective assistance of counsel when

10  trial and appellate counsel failed to raise an issue over alleged prosecutorial misconduct

11  during voir dire.  The petition alleges, without further specification, that there were "several

12  episodes of prosecutorial misconduct" during voir dire.  The petition does not refer to or

13  incorporate any other filings.

14        Respondents maintain, correctly, that Ground 3 fails to state a sufficiently specific claim

15  for relief.  Under Rule 2 of the Rules Governing Section 2254 Cases, a federal habeas

16  petition must allege the specific facts supporting each claim for relief.  A vague and

17  conclusory allegation of ineffective assistance based upon a failure to challenge unspecified

18  "several episodes of prosecutorial misconduct" fails to state a viable claim for relief.

19        Petitioner asserts in the reply, however, that his intent was to raise an ineffective

20  assistance claim that was presented in his memorandum in support of his state post-

21  conviction petition.  Petitioner must present the specific facts supporting his federal petition

22  within the verified federal petition itself.  Neither the respondents nor the Court are required

23  to search through the state court record seeking to find possible claims that petitioner perhaps

24  may have intended to present in a conclusory claim in the federal petition.

25        However, out of an abundance of caution, the Court will treat the reply as a *de facto*,

26  and *arguendo* timely, amendment raising the claim presented to the state courts.  The Court

27  further, again out of an abundance of caution, will overlook the petitioner's failure to allege

28  any specific factual allegations even within the reply.  Petitioner may not incorporate

1   arguments in the state court record but instead must make specific allegations in his federal

2   pleadings in support of his claims.

3          The Supreme Court of Nevada rejected the ineffective assistance claim presented to

4   that court on the following grounds:

> . . . Williams contended that his trial and appellate counsel were ineffective for failing to raise the issue of prosecutorial misconduct during voir dire.  In particular, Williams points to two instances, occurring during the questioning of prospective jurors Woodward and Meager, where the prosecutor impermissibly attempted to remove the presumption of innocence by informing the prospective jurors that Williams committed the charged crime and deserved the death penalty.  We conclude that the district court did not err in rejecting Williams' contention.

> Williams' contention about his trial counsels' failure to object is belied by the record.  Additionally, Williams has failed to show he was prejudiced by his counsels' allegedly deficient conduct involving voir dire.  With regard to the voir dire of prospective juror Woodward, the record reveals that Williams' trial counsel lodged an objection, and the district court advised the prospective jurors that all three possible penalties must be considered equally.  With regard to the voir dire of prospective juror Meager, although a formal objection was not lodged, Williams' co-defendant's counsel reminded the prospective jurors that Williams and his co-defendant, Robert Byford, were presumed to be innocent and that the prosecutor misspoke when he said that they committed the crimes.  Prospective juror Meager then responded: "I understand that they are presumed innocent and they're allegedly guilty."  Finally, at the beginning of voir dire, the district court advised the prospective jurors that "it's incumbent upon the State of Nevada to prove a defendant guilty beyond a reasonable doubt" and that "the defendants sit here cloaked with the presumption of innocence."  In light of the district court's advisements, Williams failed to show that the prosecutor's isolated comments during voir dire permeated the proceedings with unfairness resulting in a denial of due process.  Accordingly, the district court did not err in finding that Williams was not prejudiced by counsels' allegedly deficient conduct during voir dire.

#23, Ex. T, at 2-3 (authority discussion footnote omitted).

          Williams has not come forward with any specific factual or legal argument or with any

citation to authority in any way indicating how the Nevada Supreme Court's decision either

was contrary to or an unreasonable application of clearly established federal law as decided

by the United States Supreme Court.  The Court's independent review of the matter further

does not reflect any basis for declining to uphold the state court decision under the AEDPA.

-21-

1    See #67, Ex. 1 at 28-34 (Meager) & 75-87 (Woodward).[14]  On the showing and argument

2    made, the Court is not persuaded that Ground 3 provides a basis for federal habeas relief.

3           ***Ground 6:  Alleged Ineffective Assistance – Evidence of Witness Intimidation***

4           In Ground 6,[15] petitioner alleges that he was denied effective assistance of counsel

5    when trial and appellate counsel failed to challenge, *inter alia*, the admissibility of testimony

6    by Todd Smith – the eyewitness to the murder – about being threatened by Williams.

7           At trial, Todd Smith acknowledged that, over the course of the police investigation, he

8    told the police three different versions of what happened the night that Monica Wilkins was

9    murdered.  The first time that the police talked to him, in April 1991, he said that he, Williams

10    and Byford had been bowling that evening.  The second time, in June 1992, he acknowledged

11    that the police description of the events "sounded pretty much true," but he said that he had

12    stayed in the vehicle and did not see anything.  The third time, in July 1992, all three men had

13    been charged with the murder.  At that point, Smith described the murder to the police in

14    substantially the same manner as his later trial testimony.[16]

15           Smith testified that he told the police the first two versions of the events because he

16    was scared for his life.  According to Smith, Byford had said from the very outset, on the way

17    back from the murder scene, that he would kill Smith if he talked.  Smith testified that,

18    subsequently, after the preliminary hearing, Williams and Byford told other detainees in a

19    holding cell that Smith had been a "snitch," which resulted in Smith being attacked.

20    Thereafter, when the three were being held in the Clark County Detention Center, Williams

21    and Byford repeatedly made throat-slicing motions at him from the recreation yard.  Smith

22    took this to mean that they would kill him at the first opportunity. #59, Ex. Z, at 54 & 91-102.

23

24         [14]The Court further would note that prospective juror Woodward had categorically ruled out the death
penalty and therefore was excused for cause.  *Id.*, at 87.  The alleged prosecutorial misconduct therefore

25    most certainly did not impact that prospective juror or prejudice her against the defense, and the defense
further could not be prejudiced at trial by alleged misconduct as to a prospective juror who was not seated on

26    the jury.  The entire venire repeatedly was exposed to the proper statement of the law during the voir dire.

27         [15]Grounds 4 and 5 previously were dismissed.

28         [16]#59, Ex. Z, at 63-65, 90-97, 131-32 &163-68.

1          The Supreme Court of Nevada rejected the ineffective assistance claim based upon

2    the failure to challenge evidence of Williams' intimidation of Smith, on the following grounds:

3                    . . . Williams contended that trial and appellate counsel
            were ineffective for failing to challenge the admissibility of Todd
4            Smith's testimony about threats made by Williams.  In support of
            his contention that Smith's testimony about prior threats was
5            inadmissible, Williams cited Lay v. State[,110 Nev. 1189, 886
            P.2d 448 (1994).] We conclude that the district court did not err
6            in rejecting Williams' claim.

7                    In Lay, this court recognized that it is improper for the
            prosecutor to make repeated references to witness intimidation
8            by the defendant unless the State "produces substantial credible
            evidence that the defendant was the source of the intimidation."
9            Here, unlike the prosecutor's allegedly unfounded references in
            Lay, there was substantial and credible evidence that Williams
10           was the source of the intimidation, namely, Smith's testimony.
            Therefore, counsel acted reasonably in deciding not to challenge
11           Smith's testimony about prior threats because that testimony was
            admissible, and also relevant to show consciousness of guilt and
12           explain Smith's prior inconsistent statements.

13   #23, Ex. T, at 4-5 (authority discussion and citation footnotes omitted).

14          The Nevada Supreme Court's rejection of this claim was neither contrary to nor an

15   unreasonable application of *Strickland*.  Petitioner urges that the state courts failed to properly

16   apply the Nevada Supreme Court's *Lay* decision.  *Lay*, however, was decided as a matter of

17   state law.  The Supreme Court of Nevada is the final arbiter of Nevada state law, and the

18   state high court's holding in Williams' case that Todd Smith's testimony was admissible under

19   Nevada state decisional law is controlling on federal habeas review.  The Nevada Supreme

20   Court further was not required to follow the federal circuit decisions cited on state post-

21   conviction review regarding the admissibility of allegedly similar testimony in federal criminal

22   trials, even if it were assumed, *arguendo*, that the decisions in truth were contrary to the state

23   high court's decision in Williams' case.[17]  Given the Nevada Supreme Court holding that the

24   testimony was admissible in Williams' Nevada state criminal prosecution, petitioner cannot

25   _____

26          [17]This Court makes no holding that the federal circuit decisions in the federal criminal cases cited on
     state post-conviction review either were or were not consistent with the Nevada Supreme Court's holding on
27   the state law issue in Williams' state criminal case.  The state high court was not required to follow any
     arguably inconsistent federal circuit holding, even if, *arguendo*, a federal circuit court reached the opposite
28   conclusion regarding admission of the evidence on facts that were identical to those in Willliams' case.

1  demonstrate that there is a reasonable probability that the outcome of the trial or appeal

2  would have been different if the admission of the testimony had been challenged.

3      Ground 6 therefore fails to provide a basis for federal habeas relief.[18]

4  **Ground 7:  Due Process – Denial of Motion to Sever**

5      In Ground 7, petitioner alleges that he was denied due process when the state trial

6  court denied his motion to sever his trial from Byford's trial.

7      On direct appeal, the Supreme Court of Nevada rejected the claim presented to that

8  court on the following grounds:

9      . . . Williams asserts that the district court erred in denying
10  his motion to sever his trial from Byford's.  At trial, the State
   produced evidence of various admissions made by Byford.
11  Williams claims that this evidence improperly prejudiced
   him.[FN1]  We conclude that no error occurred in regard to this
12  evidence.

13      Joinder of defendants is within the discretion of the district
   court, whose decision will not be reversed absent an abuse of
14  discretion.  Lisle v. State, 113 Nev. 679, 688, 941 P.2d 459, 466
   (1997); see also NRS 174.165(1).  The Sixth Amendment right of
15  confrontation prevents the use at a joint trial of a nontestifying
   defendant's admission if it expressly incriminates another
16  defendant.  See Bruton v. United States, 391 U.S. 123 (1968);
   Ducksworth v. State, 114 Nev. 951, 966 P.2d 165 (1998).

17      Williams objects to testimony regarding three out-of-court
   admissions which Byford made when Williams was not present.
18  Byford's admissions concerned seeing maggots on a human
   body, being a bad person because he killed someone, and
19  getting the victim's blood on his shoes.  The district court
   specifically admonished the jury that it was not to use any of this
20  evidence against Williams.  We presume that the jury followed
   this admonition. See Owens v. State, 96 Nev. 880, 885, 620 P.2d
21  1236, 1239 (1980); Stickney v. State, 93 Nev. 285, 287, 564 P.2d
   604, 605 (1977).  Also, none of the statements in question
22  implicated Williams or even an unidentified accomplice; therefore
   no Bruton violation occurred.

23

24  _____

25  [18]In the federal petition, petitioner additionally makes a passing conclusory reference to evidence of
   intimidation of another witness, Missy Green, by adding the phrase "and the foregoing Missy Green" in a
26  sentence regarding intimidation of Smith.  Any claim of ineffective assistance for failure to challenge the
   admission of evidence of intimidation of Missy Green was not fairly presented to and exhausted in the state
27  courts.  The claim presented to the state courts spoke only of intimidation of Todd Smith.  See #23, Ex. N, at
   12-15.  The Court reviews this unexhausted snippet of a claim in Ground 6 on the merits under 28 U.S.C. §
28  2254(b)(2), on de novo review.  The five-word reference to "and the foregoing Missy Green" does not set forth
   a sufficiently specific claim for federal habeas relief.  The Court rejects the claim, such as it is, as conclusory.

1
2            Williams also claims that evidence of Byford's incriminating
3     remarks to two women in a park was improperly used against
      him. This claim has no merit. Williams was present and heard
4     the remarks and did not deny or dispute them in any way. In fact,
      Williams added an incriminating admission of his own. Thus,
5     Byford's statements were admissible against Williams as adoptive
      admissions. See NRS 51.035(3)(b); Maginnis [v.State], 93 Nev.
      [173] at 175, 561 P.2d [922] at 923 [(1977)].

6               [FN1] Additionally, Williams asserts in his
7               reply brief that the evidence against Byford was
      much stronger than against him and therefore that
8     joinder prejudiced him. This assertion is meritless.
      He also implies that joinder prevented him from
9     pursuing a defense antagonistic to Byford's, but
      does not explain what that defense was. He also
10    claims that reference to Byford's prior felony
      conviction prejudiced him (Williams), but again
11    does not explain how. We discern no merit in these
      arguments either.

12    #23, Ex. G, at 2-4.

13         In his federal petition, Williams does not continue to assert any claim of a

14    *Bruton* violation, and review of the state court record confirms that the state trial court

15    repeatedly admonished the jury to not use statements made by Byford when Williams was

16    not present against Williams.

17         Williams instead urges in the federal petition that he was prejudiced because, but for

18    the joinder, he allegedly would have been exposed to a maximum possible conviction only of

19    assault with a deadly weapon. He maintains that, in a severed trial, he could not have been

20    convicted for more than assault with a deadly weapon because, allegedly by all accounts, it

21    was Byford rather than he that fired the fatal bullets.[19]

22         The Nevada Supreme Court's rejection of the petitioner's misjoinder claim was neither

23    contrary to nor an unreasonable application of clearly established federal law. Alleged

24    improper joinder does not in itself violate the Constitution. *United States v. Lane*, 474 U.S.

25    438, 446 n. 8, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Rather, alleged misjoinder rises to the

26    level of a constitutional violation "only if it results in prejudice so great as to deny a defendant

27    _____

28        [19]#9, at 8-H.

1  his [due process] right to a fair trial." *Id*.  Neither state law regarding severance in state

2  criminal trials nor the procedural rules regarding severance in federal trials is controlling.  *E.g.,*

3  *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997).  The question instead is one of whether

4  the state court proceedings satisfied due process.  *Id.*  To prevail, the petitioner bears the

5  burden of demonstrating that the state court's failure to sever the cases rendered his trial

6  fundamentally unfair.  *Id.*

7       Petitioner contends under Ground 12 – similar to the present argument under Ground

8  7 regarding joinder – that the evidence was insufficient to sustain his conviction for murder

9  because it was Byford rather than he that fired the fatal bullets.  The Court will address this

10  underlying contention further in its discussion of Ground 12, which discussion is adopted

11  herein.  It suffices for the present with regard to Ground 7 to note that Williams' premise – that

12  he could be convicted only of assault with a deadly weapon – is fallacious.  Whether in a joint

13  or severed trial, the evidence of Williams' own actions exposed him to, and fully supported

14  a conviction for, first degree murder.  The culpability for murder of an individual who, together

15  with another individual, fires at least ten gunshots at or into another person does not turn

16  upon the fortuity of which shot or shots ultimately proved to be the fatal shot or shots.  Both

17  are fully culpable, at the very least, as an aider and abetter.  Williams accordingly cannot

18  establish such prejudice in this regard from a joint trial as would establish a due process

19  violation and warrant the overturning of his conviction.

20       The Nevada Supreme Court's rejection of the claim was neither contrary to nor an

21  unreasonable application of clearly established federal law.[20]

22       Ground 7 therefore fails to establish a basis for federal habeas relief.

23       / / / /

24       / / / /

25

26

27  [20]The Court is not persuaded that the federal criminal decision relied upon by petitioner in his reply, *Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), which was decided under Rules 8(b) and 14 of the Federal Rules of Criminal Procedure, leads to a different result in this case.

28  *See,e.g., Grisby, supra.*

***Ground 9:  Due Process – References to Custody and Prior Trial***

In Ground 9,[21] petitioner alleges that he was denied due process by references in his second trial to his being in custody and to his first trial.  Petitioner alleges that the State elicited testimony from Tammy Silvey that he had been in custody for at least a year prior to trial and testimony from Todd Smith and Jeanette Daniels that there had been a prior trial.

Tammy Silvey was called by Byford.  In cross-examining Silvey, the prosecutor sought to establish that the witness was biased due to a close relationship with Byford.  The prosecutor referred to "visitor logs where people go and see Mr. Byford," and he asked Silvey whether she would agree with the logs that she had seen Byford over a hundred of times but only once accompanied by her husband.  No objection was raised to the questioning regarding the visitor logs.  The prosecutor then asked whether Silvey and a Joni Drayer visited together, with Drayer visiting Williams "pretty often."  When the prosecutor asked whether Drayer was married to Paul Drayer, Williams' counsel objected to that question on the basis of relevance.  The state trial court sustained the relevancy objection.  As the court was sustaining the objection, counsel continued his sentence with "and he is really getting – ," but the court said again that the objection was sustained and "[l]et's move on to another subject." No objection to the indirect references to custody was articulated by defense counsel, and no motion for a mistrial was made.  Later in the cross-examination, the prosecutor asked whether the witness had ever sent provocative photographs to Williams or Byford "while they've been in custody."  Objections were made by defense counsel to followup questions as to whether other witnesses might testify to the contrary of Spivey's testimony.  Neither defendant made an objection or a motion for a mistrial based on the reference to custody.[22]

The State did not elicit any testimony from Todd Smith, the eyewitness, on direct as to the prior trial.  Instead, Smith referred to "the last trial" while being cross-examined by Byford's counsel regarding a prior inconsistent statement in the prior trial testimony.  Counsel

_____

[21]Ground 8 previously was dismissed.

[22]#70, Ex. 5, at 63-67.  As to the photographs, Spivey responded: "No, I wouldn't say provocative."

-27-

had referred to the prior trial as a "prior proceeding," but the witness, by all appearances inadvertently, referred to 'the last trial" once in the course of extended questioning about the prior testimony.  Williams' counsel objected and moved for a mistrial, and the argument on the motion was deferred to and conducted on a break outside the presence of the jury.  The court admonished the witness, strongly, to not mention the prior trial again, and the court also instructed the State to again emphasize to all of its witnesses to not refer to the prior trial in their testimony.  Having taken these precautions, however, the court noted that it had not been presented by the defense with any case law holding that the mention of a prior trial constituted grounds for a mistrial.  The state court accordingly denied the motion.[23]

Later in the trial, the State called Jeanette Daniels to testify – only as to Byford and not as to Williams – regarding inculpatory statements made to her by Byford.  Daniels made no reference to a trial during direct examination.  During cross-examination by Byford's counsel, counsel pursued a lengthy line of questioning seeking to determine how Daniels came to talk to the police, who she talked to before talking to the police, and whether and what she had heard about the case before talking to the police.  In responding to this line of questioning, Daniels indicated that "one of these people from the trial contacted me" before she talked to the police.  When counsel pressed her to clarify an earlier reference made, first by counsel, to "details," she stated "[t]he details being that there was going to be a trial."  On the next break, a motion for mistrial was made based on, *inter alia*, the contention that Daniels had referred to the prior trial.  The state trial court found that no inference could be drawn from Daniels' testimony that she was referring to a prior trial, and the court denied the motion.[24]

On direct appeal, the Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

> . . . Williams objects to prosecutorial references to his being in custody and references by witnesses to the first trial.

---

[23]#59, Ex. Z, at 117-19 & 157-61.

[24]#70, Ex.4, at 87-94 & 97-101.

> During cross-examination of a defense witness, the prosecutor referred to "visitor logs where people go and see Mr. Byford" and to Williams and Byford being "in custody."  Williams claims that the remarks were improper and cites Haywood v. State, 107 Nev. 285, 288, 809 P.2d 1272, 1273 (1991)("Informing the jury that a defendant is in jail raises an inference of guilt, and could have the same prejudicial effect as bringing a shackled defendant into the courtroom.").
>
> Neither Williams nor Byford objected to either remark. Failure to object to the admission of evidence generally precludes review by this court, although the court may address plain error and constitutional error sua sponte.  Sterling v. State, 108 Nev. 391, 394, 834 P.2d 400, 402 (1992).  We conclude that no plain or constitutional error occurred and decline to reach this issue.
>
> Williams also claims that he was prejudiced by references to his first trial, to which he did object, made by two State witnesses in response to questions by Byford.  Williams cites no authority and provides no argument for concluding that the remarks were improper or prejudicial.   "It is appellant's responsibility to present relevant authority and cogent argument; issues not so presented need not be address by this court." Maresca v. State, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987).  We therefore decline to review this issue as well.

#23, Ex. G, at 9-10.

Respondents contend that Ground 9 is barred by procedural default because the Nevada Supreme Court rejected the claim on adequate and independent state law grounds.

Under the procedural default doctrine, federal review of a habeas claim may be barred if the state courts rejected the claim on an independent and adequate state law ground due to a procedural default by the petitioner.  Review of a defaulted claim will be barred even if the state court also rejected the claim on the merits in the same decision.  Federal habeas review will be barred unless the petitioner can demonstrate either: (a) cause for the procedural default and actual prejudice from the alleged violation of federal law; or (b) that a fundamental miscarriage of justice will result in the absence of review.  *See,e.g.,Bennet v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003).

In his reply, petitioner contends only that the Supreme Court of Nevada erroneously rejected the claim on procedural grounds, asserting that he did object at trial.

With regard to the references to custody during the cross-examination of Spivey, the above-referenced portion of the trial transcript contains no contemporaneous objection to the

1  indirect and direct references to custody.  Defense counsel made objections to the question

2  as to whether Joni Drayer was married and to questions as to whether other witnesses might

3  testify contrary to Spivey's testimony regarding the photographs.  No contemporaneous

4  objection was made to the indirect and direct references to Williams being in custody.

5  With regard to the references to the prior trial by Todd Smith and Jeanette Daniels, the

6  Nevada Supreme Court's ruling was not based on a failure to present a contemporaneous

7  objection.  The state high court in fact expressly noted that objection had been made to the

8  references to the prior trial.  The court instead declined to consider the claim because

9  Williams had not presented authority or argument *on the appeal* tending to establish that the

10  remarks were improper or prejudicial.  Review of the brief on appeal confirms that Williams

11  presented no authority in the appellant's brief tending to establish that a reference to a prior

12  trial was improper or prejudicial.[25]

13  Petitioner's argument that the Supreme Court of Nevada erroneously applied its

14  procedural bars therefore is not supported by the record.  The Court accordingly concludes,

15  on the showing and arguments made, that Ground 9 is barred by procedural default.

16  Ground 9 therefore does not provide a basis for federal habeas relief.[26]

17

18  [25]See #23, Ex. D, at 36-39.  The brief cites authority regarding references to custodial status, but the
19  brief does not contain any authority tending to establish that the references to the prior trial were improper.

20  [26]The Court additionally notes that, even on federal habeas review, petitioner still has not provided
    any apposite authority tending to establish that a reference to a prior trial is improper or prejudicial.  The Court
21  did not uncover any such authority in independent research.  In *Chaffin v. Synchcombe*, 412 U.S. 17, 93 S.Ct.
    1977, 36 L.Ed.2d 714 (1973), the United States Supreme Court held that the rendition of a higher sentence
22  by a second jury on a retrial did not violate double jeopardy or due process guarantees.  In discussing the fact
    that the second jury had not been informed of the first jury's sentence, the Supreme Court observed: "It is . . .
23  likely that the jury will be aware that there was a prior trial, but it does not follow from this that the jury will
    know whether that trial was on the same charge, or whether it resulted in a conviction or mistrial."  412 U.S. at
24  26-27, 93 S.Ct. at 1983.  While the statement in *Chaffin* would be *dicta* as to the claim presented by Williams,
    the apparent nonchalance reflected in the Supreme Court's discussion of the likely prospect that a second
25  jury would learn of the prior trial tends to undercut any claim that a reference to a prior trial gives rise to the
    denial of a fundamentally fair trial.  In all events, whether at trial, on appeal, or now on federal habeas review,
26  petitioner never has provided apposite authority tending to establish that the inadvertent references to the
    prior trial were a matter of any, much less constitutional, significance.

27
    The Court further would note that the state district court's finding that Jeanette Daniels did not refer to
28  (continued...)

-30-

***Ground 10:  Penalty Phase – Aggravating Circumstance***

In Ground 10, petitioner – who was not sentenced to death in the second trial – alleges that he was denied due process and equal protection when the state trial court denied a joint defense motion to strike an aggravating circumstance, resulting in petitioner allegedly being tried by a "death-qualified" jury.

On direct appeal, the Supreme Court of Nevada held as follows:

> . . . Williams claims that the district court erred in denying a pretrial motion to strike the aggravating circumstance of torture and mutilation because there was no factual basis for the aggravator and the aggravator is unconstitutionally vague.  He contends that he was prejudiced because the aggravator required the jury to be "death qualified."  We decline to address this issue.  We have held that "a defendant not sentenced to death cannot, on appeal, claim that he has suffered any prejudice as a result of jury instructions on aggravating circumstances."  Phenix v. State, 114 Nev. 116, 119, 954 P.2d 739, 740, cert. denied, 524 U.S. 958 (1998).  Furthermore, Williams fails to establish how a death-qualified jury prejudiced him.  See Aesoph v. State, 102 Nev. 316, 318, 721 P.2d 379, 380 (1986)(holding that the defendant has the burden of establishing that the jury was not neutral).

#23, Ex. G, at 7-8.

The Nevada Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.  Petitioner cites no authority from the United States Supreme Court holding that an alleged error as to the aggravating circumstances in a capital case causes prejudicial constitutional error to a defendant who instead has been sentenced to a life sentence.

Ground 10 therefore does not provide a basis for federal habeas relief.[27]

_____

[26](...continued)

the prior trial did not constitute an unreasonable determination of fact.  When this Court read through the transcript looking for a reference to the prior trial, the Court did not come across any testimony that, in context, necessarily made a reference to the prior trial as opposed to the then-current trial.  The Court had to review the transcript of the argument to determine what testimony defense counsel thought had referred to a prior trial, because no such reference or inference was apparent from the testimony itself.

[27]Petitioner further urges in his reply – for the first time in federal court – that he sustained prejudice because the striking of the aggravating circumstance would have required that his trial be severed from

(continued...)

-31-

### *Ground 12:  Sufficiency of the Evidence*

In Ground 12,[28] petitioner challenges the sufficiency of the evidence to support his conviction for first degree murder.

Williams contends that the evidence was insufficient because: (a) Todd Smith, the eyewitness, gave three different versions of the events to the police; (b) allegedly all of the witnesses and evidence clearly demonstrated that the fatal bullets were fired by Byford and not Williams; (c) allegedly all of the witnesses and evidence clearly demonstrated that he was not involved in the post-mortem burning of Monica Wilkins' body; (d) allegedly all of the witnesses and evidence clearly demonstrated that Williams had no malice toward the victim or motive but that Todd Smith did; (e) "[d]uring all relevant times, any and all incriminating statements, alleged or otherwise attributed to Petitioner, remain under suspicion or other[wise] challenge[d] as false, or otherwise inadmissible;" and (f) "[d]uring all relevant times, any and all incriminating statements, alleged or otherwise attributed to Petitioner, were, and remain inconsistent with first degree murder."

On direct appeal, the Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

> . . . Williams contends that the evidence was insufficient to support his conviction.  He says there was insufficient evidence that the murder was willful, deliberate, and premeditated.  He also points to the evidence that Byford fired the fatal shots into Wilkins' head.  He also asserts that Smith had a motive to kill Wilkins, and he questions the credibility of the State's witnesses.
>
> When this court reviews the evidence supporting a jury verdict, the question is whether the jury, acting reasonably, could

---

[27](...continued)

Byford's.  No such legal theory was presented to the Supreme Court of Nevada in support of the claim on direct appeal.  See #23, Ex. D, at 32-35.  The Court in any event is not persuaded by this unexhausted, speculative, and unsupported legal theory.  The Court further would note that the Ninth Circuit has held that the language regarding torture and mutilation in the aggravating circumstance in question is "sufficiently clear and objective" to pass constitutional muster.  *See Deutscher v. Whitley*, 884 F.3d 1152, 1162 (9th Cir. 1989), *vacated on other grounds sub nom. Angelone v. Deutscher*, 500 U.S. 901, 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991).  *See also Valerio v. Crawford*, 306 F.3d 742, 751 (9th Cir. 2002)(discussing *Deutscher*).

[28]Ground 11 previously was dismissed.

1  have been convinced of the defendant's guilt beyond a
2  reasonable doubt by the evidence it had a right to consider.  See
   Wilkins v. State, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980). It
3  is for the jury to determine the weight and credibility to give
   conflicting testimony, and the jury's verdict will not be disturbed
4  on appeal where substantial evidence supports the verdict.  See
   Bolden v. State, 97 Nev. 71, 624 P.2d (1981).

5  We conclude that the evidence that Williams murdered
   Wilkins was overwhelming.  Smith testified that Williams shot
6  Wilkins repeatedly, and Williams made a number of incriminating
   admissions, either directly or by adoption.  As discussed above,
7  the evidence in this case is also clearly sufficient to establish
   deliberation and premeditation on Williams's part.  That Byford
8  may have delivered the wounds which proved fatal in no way
   lessens Williams' culpability: a person who aids and abets an act
9  constituting an offense is a principal and subject to the same
   punishment as one who directly commits the act.  See NRS.
10 195.020.

11 #23, Ex. G, at 10-11.

12      The Nevada Supreme Court's rejection of Williams' challenge to the sufficiency of the

13 evidence was neither contrary to nor an unreasonable application of clearly established

14 federal law.  On a sufficiency of the evidence challenge, the habeas petitioner faces a

15 "considerable hurdle."  Davis v. Woodford, 333 F.3d 982, 992 (9th Cir. 2003).  Under the

16 standard announced in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560

17 (1979), the jury's verdict must stand if, after viewing the evidence in the light most favorable

18 to the prosecution, any rational trier of fact could have found the essential elements of the

19 offense beyond a reasonable doubt.  E.g., Davis, 333 F.3d at 992.  Accordingly, the reviewing

20 court, when faced with a record of historical facts that supports conflicting inferences, must

21 presume that the trier of fact resolved any such conflicts in favor of the prosecution and defer

22 to that resolution, even if the state court trier of fact's resolution of specific conflicts does not

23 affirmatively appear in the record.  Id.  The Jackson standard is applied with reference to the

24 substantive elements of the criminal offense as defined by state law.  E.g., Davis, 333 F.3d

25 at 992.  When the deferential standards of the AEDPA and Jackson are applied together, the

26 controlling question for decision on federal habeas review thus becomes one of whether the

27 Nevada Supreme Court's decision reflected an unreasonable application of the Jackson

28 standard to the evidence presented at trial.  See,e.g., Juan H. v. Allen, 408 F.3d 1262, 1274-

-33-

1    75 (9th Cir. 2005), *cert. denied*, 546 U.S. 1137, 126 S.Ct. 1142, 1145, 163 L.Ed.2d 1000

2    (2006).

3          The Nevada Supreme Court's decision was neither contrary to nor an unreasonable

4    application of *Jackson*.[29] None of the petitioner's arguments challenging the state high court's

5    rejection of his claim are persuasive.

6          Petitioner first urges that the evidence was insufficient because Todd Smith gave three

7    different versions of the events to the police.   Credibility determinations are for the jury to

8    resolve, however.   The variances between the three statements and Smith's stated reasons

9    for the varying stories were fully explored during cross-examination.[30]   If the jury believed

10   Smith's testimony at trial, that is the end of the matter insofar as *Jackson* review is concerned.

11         Petitioner next contends that the evidence was insufficient to convict him for first

12   degree murder because, allegedly, all of the witnesses and evidence clearly demonstrated

13   that the fatal bullets were fired by Byford and not Williams.

14         At the outset on this argument, the Court notes that all of the evidence did not

15   necessarily establish that Byford rather than Williams fired the fatal bullet or bullets.  A portion

16   of Todd Smith's testimony suggests that, while Williams fired from behind Wilkins, Williams

17   potentially fired rounds at or into the back of Wilkins' head or neck rather than, or in addition

18   to, firing at or into her upper back.[31]   The medical examiner, Dr. Sheldon Green, M.D., testified

19   that, of the two bullets recovered from Wilkins' head, one entered at the back of the head and

20   the other entered at the left temple.   Dr. Green could not determine from the available

21   evidence the range at which either bullet was fired.   He further did not observe any bullet

22   _____

23         [29]In his reply, petitioner additionally contends that his conviction should be overturned because the
     Supreme Court of Nevada did not cite or apply *Jackson*.  The *Wilkins* case cited by the state high court did

24   cite *Jackson*, and the governing standard applied by the court in Williams' case did not differ in substance
     from the *Jackson* standard.  In all events, however, it is established law that a state court decision is not

25   contrary to established federal law merely because it does not cite the United States Supreme Court's
     opinions, and the Supreme Court has held that a state court need not even be aware of its precedents, so

26   long as neither the reasoning nor the result of its decision contradicts them.  *E.g., Mitchell,* 124 S.Ct. at 10.

27         [30]See the discussion and the state court record materials cited, *supra*, regarding Ground 6.

28         [31]#59, Ex. Z, at 152-54 (Todd Smith).

                                        -34-

wounds to the neck or the upper back area between the shoulder blades, and the tissue in these areas remained sufficiently intact for any such bullet wounds to have been observed. He testified that either one of the shots to the head could have been fatal.[32]

The evidence therefore did not conclusively demonstrate that both of the rounds recovered from Wilkins' head were from shots fired by Byford rather than from a shot or shots fired by Williams.[33]   The final shots fired by Byford, after all, were fired to "make sure" that Wilkins – who already had been shot multiple times and had fallen to the ground a second time – was dead.  The evidence therefore did not clearly and unequivocally demonstrate that the fatal bullet or bullets necessarily both were fired by Byford as opposed to Williams.

In all events, however, as the Nevada Supreme Court's decision reflects, this factual point in the final analysis is not determinative.  The evidence clearly supported a verdict of guilty as to Williams at the very least as an aider and abetter.  Any argument that an individual who fires at least eight of the at least ten shots fired at or into a murder victim does not aid and abet the murder is a frivolous argument.  The fortuity of which bullet or bullets actually proved to be fatal has no bearing on each shooter's culpability as, at the very least, an aider and abetter, which carries the same culpability as a principal.  The petitioner's argument in this regard is wholly without merit.

Petitioner next contends that the evidence was insufficient to convict him for first degree murder because, allegedly, all of the witnesses and evidence clearly demonstrated that he was not involved in the post-mortem burning of Monica Wilkins' body.  Even if the Court were to assume, *arguendo*, that the evidence did not support any inference of any involvement by Williams in the burning of Wilkins' body, any such lack of involvement in the

---

[32]#70, Ex. 4, at 36, 46, 50-52, 55-57, 64-65, 68, 70-71 & 74.  Both the firearms examiner and the medical examiner testified that a .25 caliber semiautomatic was, as characterized by the medical examiner, "a notoriously inaccurate weapon." *Id*., at 70 (medical examiner); *id*., at 25 & 30 (firearms examiner).

[33]Moreover, due to the burning, decomposition, and feeding on the body, additional bullets from additional shots may have been lost from within the body before it was recovered, and considerable tissue had been lost to animal feeding.  The medical examiner testified only qualifiedly that there were no fatal body shots "as far as we can tell." #70, Ex. 4, at 44 & 48-51.  Testimony as to the exact number of shots fired by either man further is not necessarily infallible.

1   burning of the body would not negate his guilt for the first degree murder.  That is, the State

2   was not required to prove any involvement on his part in the burning of the body to establish

3   any element of first degree murder.[34]

4          Petitioner next contends that the evidence was insufficient to convict him because,

5   allegedly, all of the witnesses and evidence clearly demonstrated that Williams had no malice

6   toward the victim or motive but that Todd Smith did.  With regard to motive, the State was not

7   required to prove motive to prove murder.[35]  With regard to malice, there was ample evidence

8   of malice by Williams, by both his words and deeds.  Williams' discussions with Byford before

9   the murder about "get[ting] rid of" Monica Wilkins because she was always "playing games

10  with our heads, as well as his statement to her while he and Byford were in the process of

11  murdering her that he shot her because she was "a bitch," provided ample evidence – from

12  Williams own mouth – of malice.  Williams' unprovoked firing of multiple shots at or into

13  Wilkins' body further constituted fairly substantial evidence of malice.  Todd Smith's feelings

14  regarding Wilkins, and the argument that he had more motive to kill Wilkins because she had

15  flirted with him and slept with him but not had sex with him and because they got into an

16  argument, were fully explored at trial.  The jury instead believed the evidence tending to

17  establish that Williams was guilty of first degree murder.  Such a choice by the jury between

18  competing inferences is virtually unassailable by a court reviewing the sufficiency of the

19  evidence under *Jackson*.  The fact that there may have been evidence supporting contrary

20  inferences does not negate the sufficiency of the strong evidence supporting the jury's verdict.

21         Petitioner next contends that "[d]uring all relevant times, any and all incriminating

22  statements, alleged or otherwise attributed to Petitioner, remain under suspicion or other[wise

23  challenge[d] as false, or otherwise inadmissible."  Petitioner's challenges to the evidence of

24

---

25         [34]To the extent that the burning of the body may have been relevant to the aggravating circumstance
    charged for imposition of the death penalty, Williams was not sentenced to death, as discussed under
26  Ground 10.  An alleged absence of evidence of involvement in the burning of the body therefore had no
    bearing either on the sufficiency of the evidence of his guilt for first degree murder or on the sufficiency of the
27  evidence supporting the sentence that he actually received.

28         [35]*E.g.*, #59, Ex. FF, Instruction No. 25.

his prior inculpatory statements were rejected.  Regardless of whether petitioner believes the evidence to be "under suspicion" or "challenged as false," the evidence of his inculpatory statements was admitted at his trial and fully supports his conviction for first degree murder. Under *Jackson*, the reviewing court must presume that all of Williams' suspicions, questions or factual challenges as to the evidence admitted at trial were resolved against him by the jury, and the court must defer to the jury's resolution of the competing factual inferences.

Finally, petitioner contends that "[d]uring all relevant times, any and all incriminating statements, alleged or otherwise attributed to Petitioner, were, and remain inconsistent with first degree murder."  Petitioner's statements – *e.g.,* to Monica Wilkins that he shot her because she was "a bitch;" to Robyn Jackman acknowledging his involvement with Byford in the shooting; and to Wayne Porretti that he had shot Monica Wilkins in the back, that he and Byford "emptied a couple clips" during her murder, and that they shot her "because she was a bitch" – all are wholly consistent rather than inconsistent with his conviction for first degree murder.

Petitioner's challenge to the sufficiency of the evidence in Ground 12 accordingly does not provide a basis for federal habeas relief.  The Nevada Supreme Court's rejection of this claim was amply supported by the trial record and further was fully in accord with – and most certainly not contrary to or an unreasonable application of – the clearly established federal law in *Jackson*.

### *Ground 13: Alleged Ineffective Assistance  – Marijuana Intoxication Defense*

In Ground 13, petitioner alleges that he was denied effective assistance of counsel when his trial and appellate counsel failed to pursue an issue as to his mental state at the time of the offense based upon evidence "during the trial" that he had smoked marijuana a short time prior to the murder.

In Williams' state post-conviction petition, which was pursued with the assistance of counsel, petitioner alleged that evidence was presented "[d]uring the trial . . . indicating that Mr. Williams had smoked marijuana a short time prior to the incident."  No trial record cite was given to the evidence, and the nature of the evidence was not specified further.  Petitioner

contended, *inter alia*, that defense counsel was ineffective for failing "to present this evidence during the guilt phase" and that, if counsel had pursued a defense based upon intoxication, "he could have established a defense that would have demonstrated that Mr. Williams lacked the mens rea necessary to find him guilty beyond a reasonable doubt for the crimes charged."[36]

No supporting evidence was tendered with the counseled state petition tending to establish either: (a) the amount of marijuana ingested; (b) what intoxicating effect would result from the unspecified marijuana use vaguely referenced in the petition; or (c) what the resultant effect would be on Williams' mental state with regard to the intent required for first degree murder.

Similarly, in the federal petition, Williams does not identify where the alleged evidence of marijuana intoxication is in the state trial record.

The only trial testimony regarding marijuana usage that this Court could locate in the state trial record was in the transcript of Byford's testimony from the first trial, which Williams introduced over Byford's objection. Williams introduced the transcript of Byford's prior trial testimony, in the main, in order to present Byford's version of the events. The evidence thus in fact was presented in the guilt phase. According to Byford's testimony from the first trial, Todd Smith and Monica Williams were dating and Smith shot Williams during a quarrel between the two. According to Byford, he and Williams aided only in concealing the crime.

During Byford's testimony, he testified that when they first stopped at the spot in the desert where Wilkins was murdered, he and Williams "blazed a few bowls" of marijuana in a pipe while sitting down outside the Jeep. Byford testified that the two of them sat there for "[m]aybe about fifteen minutes." After that, according to Byford, Todd Smith and Monica Wilkins exited the vehicle in the midst of a heated argument. They walked a short distance away, still arguing, while Byford and Williams "were still sitting there smoking out of the pipe." Smith allegedly shot Wilkins a short time thereafter. #59, Ex. DD, at 44-53.

---

[36]#23, Ex. N, at 15-17.

-38-

1   The Supreme Court of Nevada rejected the ineffective assistance claim on the record

2   presented to that court on the following grounds:

3           . . . Williams contended that trial counsel was ineffective
    for failing to present a voluntary intoxication defense during the
4   guilt phase. Specifically, Williams contended that his trial counsel
    should have presented evidence that Williams smoked marijuana
5   prior to the shooting and, therefore, lacked the necessary intent
    to commit first-degree murder. We conclude that the district court
6   did not err in rejecting Williams' claim. The decision not to
    present a voluntary intoxication defense was a reasonable tactical
7   decision. Williams' defense at trial was that Smith shot the victim,
    whom Smith had been dating, and then falsely accused Williams
8   and Byford of the killing for a favorable plea bargain. We
    conclude that trial counsel was not ineffective for failing to raise
9   the intoxication defense because it was inconsistent with
    Williams' defense theory that he was not the shooter. Moreover,
10  even assuming an alternative defense theory would have been
    appropriate, we conclude that the voluntary intoxication theory
11  had no reasonable likelihood of success in light of the
    overwhelming evidence presented against Williams. In particular,
12  at trial, Smith testified that Williams shot the victim, and several
    witnesses testified that Williams made direct or implicit
13  incriminating admissions. Accordingly, trial counsel was not
    ineffective for failing to present a voluntary intoxication defense
14  during the guilt phase."

15  #23, Ex. T, at 4-5 (citation footnote omitted).

16      The Nevada Supreme Court's rejection of this claim was neither contrary to nor an

17  unreasonable application of *Strickland*.

18      At the outset as to this claim, the unspecified evidence of marijuana use to which

19  petitioner apparently refers in fact was presented by trial counsel during the guilt phase.

20      The Court further concurs with the Supreme Court of Nevada that, on the face of the

21  record presented, petitioner cannot establish either deficient performance or resulting

22  prejudice from a failure to further pursue a voluntary intoxication defense based on smoking

23  several pipe bowls of marijuana with a second person for approximately fifteen to twenty

24  minutes immediately prior to a murder. Alternative defense theories sometimes are

25  advisable, at least in theory. However, on the face of the record in this case, an argument in

26  essence that "I did not do it, but, if I did, I was too stoned to intend what I was doing," based

27  upon fifteen to twenty minutes of smoking marijuana, more likely would have landed Williams

28  on death row than resulted in an acquittal or a conviction on a lesser charge. Credibility with

1    a jury is a precious commodity, particularly in a capital case.  It is highly unlikely that a

2    competent defense lawyer would expose his client to a potential death sentence based upon

3    an alternative defense that impliedly conceded the homicide, even if "only in the alternative,"

4    and sought to excuse the murder on such a weak voluntary intoxication defense.  It certainly

5    was not ineffective assistance to decline to pursue such a course.  In the practical world

6    where criminal cases are tried, few, if any, juries would find a defendant – particularly on the

7    strong evidence of intent presented in this case – not to have the requisite culpable state of

8    mind because he had smoked marijuana for fifteen to twenty minutes prior to the murder.[37]

9         Moreover, on state post-conviction review, the represented petitioner did not tender

10   sufficient evidence tending to establish that he actually had an in truth viable voluntary

11   intoxication defense that was not pursued.  Under Nevada state post-conviction practice, a

12   petitioner must attach affidavits, records or other evidence supporting the factual allegations

13   of the petition, and he may not present merely an unsubstantiated claim.  *See* N.R.S.

14   34.370(4).   Accordingly, the post-conviction petitioner may not present merely an

15   unsubstantiated allegation that his trial counsel failed to pursue a viable voluntary intoxication

16   defense.  He instead must tender evidence tending to establish that there in fact was

17   adequate competent evidence supporting a voluntary intoxication defense.

18        Evidence merely that a defendant consumed intoxicants, without more, is insufficient

19   to establish a viable voluntary intoxication defense under Nevada state law.  As explained by

20   the Supreme Court of Nevada in *Nevius v. State*:

21   ────────────────

22        [37]The Court additionally notes that the version of the events in which Byford and Williams smoked
     marijuana comes from Byford's account in which Todd Smith instead commits the murder.  If the jury

23   accepted Byford's testimony as true, then the jury would not need to concern itself with whether Williams was
     too intoxicated by marijuana to have the requisite intent.  If the jury instead rejected Byford's testimony

24   regarding who committed the murder, as it did in this case, the likelihood that the jury nonetheless would find
     his testimony about the marijuana use credible would appear to be remote.  Byford's testimony about the

25   marijuana use sought to distance the two men from the events immediately leading up to the murder, and if
     the jury found, as they did, that Williams and Byford instead murdered Monica Wilkins, they would be

26   accepting an entirely alternate version of the events that was inconsistent with Byford's testimony about the
     marijuana use.  That is, in a real trial, it would have been problematic to try and "fit" the Byford testimony

27   regarding marijuana use into a defense argument that instead assumed that Williams killed Wilkins but did so
     without the requisite intent.  Byford's marijuana use testimony came from an alternate version of the facts that

28   differed entirely from Todd Smith's description of what the two men were doing before they murdered Wilkins.

-40-

> It is true that voluntary intoxication may negate specific intent, and an accused is entitled to an instruction to that effect if there is some evidence in support of his defense theory of intoxication.  *See, e.g., Williams v. State*, 99 Nev. 530, 665 P.2d 260 (1983).  Here, however, there was no evidence presented at the guilt phase to the effect that appellant was intoxicated at the time of the killing.  The evidence showed only that he consumed intoxicants: David Nevius testified that the four men had a bottle of wine with them before the burglary, and that appellant had smoked marijuana.   In order for a defendant to obtain an instruction on voluntary intoxication as negating specific intent, the evidence must show not only the defendant's consumption of intoxicants, but also the intoxicating effect of the substances imbibed and the resultant effect on the mental state pertinent to the proceedings.  *See State v. Bourdlais*, 70 Nev. 233, 265 P.2d 761 (1954)(decided under precursor of NRS 193.220); *State v. Boyles*,112 Ariz. 63, 537 P.2d 933 (1975); *see also People v. Harris*, 28 Cal.3d 935, 171 Cal.Rptr. 679, 623 P.2d 240 (Cal.), *cert. denied*, 454 U.S. 882, 102 S.Ct. 365, 70 L.Ed.2d 192 (1981).  The instruction on voluntary intoxication [therefore] was properly refused.

101 Nev. 238, 249, 699 P.2d 1053, 1060 (1985).  On state post-conviction review in Williams' case, the represented petitioner referred only to evidence of alleged consumption of marijuana, and petitioner did not tender any evidence tending to show the intoxicating effect of the amount of marijuana that he allegedly smoked or the resulting effect on his mental state.  Absent such evidence, petitioner failed to tender to the state courts adequate evidence tending to establish that trial counsel failed to pursue a viable voluntary intoxication defense.  Referring, vaguely, only to prior trial testimony that Williams allegedly smoked marijuana for fifteen to twenty minutes did not at all establish that trial counsel failed to pursue a viable voluntary intoxication defense.

The state high court's rejection of this, at bottom, factually unsupported claim of ineffective assistance of counsel accordingly was neither contrary to nor an unreasonable application of clearly established federal law.

Ground 13 therefore does not provide a basis for federal habeas relief.[38]

---

[38]Petitioner also claims in the federal petition that appellate counsel was ineffective for failing to raise the issue on direct appeal.  This claim of ineffective assistance of appellate counsel was not fairly presented to and exhausted in the state courts.  The claim in state court alleged ineffective assistance only of trial counsel.  See #23, Ex. N, at 15-17.  In any event, appellate counsel could not have been ineffective for failing
(continued...)

1   ***Ground 14: Closing Argument – Reference to Co-Defendant's Lack of Alibi Defense***

2       In Ground 14, petitioner alleges that he was denied due process when the prosecutor

3   referred in his closing argument to co-defendant Byford's failure to call an alibi witness.

4       The state's court rebuttal closing argument included the following:

5

6   MR. KEPHART:        . . . .  And this alibi.  Robert [Byford] says
                        that he went into Sam's Town to the bowling
                        alley, and he knew somebody that he met
7                       through Billy and Chad, and that he was
                        going to rent these shoes, or rent the lanes,
8                       he wanted to pay for the lanes, to build his
                        alibi.  Where's that person?

9   MR. BAILUS:         Objection, Your Honor, the State – –

10  MR. SCHIECK:        Objection, Your Honor, we have no burden
                        – –
11

12  MR. BAILUS:         The defendant has no burden.

13  THE COURT:          Sustained.

14  MR. SCHIECK:        Ask it be stricken.

15  THE COURT:          Be stricken.

16  #59, Ex. DD, at 191-92.

17      On direct appeal, the Supreme Court of Nevada held as follows:

18

19  _____

20      [38](...continued)
    to raise an issue that was not raised and preserved at trial, and petitioner further did not establish that he had
21  an in truth viable voluntary intoxication defense, which would be necessary to show prejudice.

22      Petitioner's reliance upon *Alford v. State*, 111 Nev. 1409, 906 P.2d 714 (1995), is misplaced.  He
    contends that *Alford* placed his counsel under a "mandate" to include state-of-mind evidence.  In *Alford*, the
23  defendant had entered his ex-wife's trailer and killed her new boyfriend by cutting his throat.  The Supreme
    Court of Nevada reversed the conviction for first-degree murder on the basis that the State had failed to
24  provide adequate notice in the charging document that the State was pursuing an alternative felony murder
    theory based upon alleged burglary.  The high court further stated in a footnote that the trial court's refusal to
25  allow the defense to present psychiatric evidence as to Alford's mental state at the time of the offense was an
    "error of major consequence."  111 Nev. at 1411 n.1, 906 P.2d at 715 n.1.  The defense had sought to
26  present psychiatric evidence that Alford was so overcome by emotions of hate, anger, and jealousy as to be
    incapable of forming the requisite intent for first degree murder.  *Alford* made no pronouncement mandating
27  that capital defense counsel pursue every conceivably possible state-of-mind defense in every case without
    regard to the facts and evidence of the particular case.  *Alford* is completely distinguishable from the present
28  case.  Williams never tendered evidence tending to establish that he had a viable intoxication defense.

-42-

1
2
3
4
5
6
7

> . . . Williams objects to the prosecutor's question in closing argument – "Where's that person?" – referring to someone that Byford had intended to use to fabricate an alibi. Williams immediately objected, and the court ordered the question stricken. The prosecutor's question constituted comment on the defense's failure to call a witness, which improperly shifted the burden of proof to the defense. See Rippo v. State, 113 Nev. 1239, 1253, 946 P.2d 1017, 1026 (1997). However, the issue was completely peripheral because the alibi was not raised as a defense; in fact, the jury was informed that Byford admitted that the alibi was false. Furthermore, the district court immediately ordered the question stricken. In light of the evidence against Williams, the error was harmless. See id.

8  #23, Ex. G, at 4.

9        The Nevada Supreme Court's rejection of this claim was neither contrary to nor an

10  unreasonable application of clearly established federal law. Petitioner cites no apposite

11  decision of the United States Supreme Court holding that a state criminal defendant is denied

12  due process of law if the State comments on either his or a co-defendant's failure to call an

13  alibi witness.[39]   Indeed, as respondents correctly note, in federal criminal trials, it is

14  permissible for the prosecution to comment upon a defense failure to call a witness so long

15  as the prosecution does not comment on the defendant's failure to himself testify. See, e.g.,

16  United States v. Cabrera, 201 F.3d 1243, 1250 (9th Cir. 2000). Given the absence of any

17  apposite United States Supreme Court authority supporting Williams due process claim, given

18  _____

19  [39]Petitioner relies upon Graves v. United States, 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1893).
20  Graves, however, actually would support a holding that the prosecutor's argument provided no basis for
reversal. In Graves, the defendant was charged in federal court with the murder of a man in what was
21  described in the opinion as the Indian Territory. The murderer allegedly had been traveling with his wife and
two children. Graves asserted an alibi defense on the basis that he and his party were 100 miles or more
22  away from the location of the murder at the relevant time. Graves' wife was in town during the trial, but she
did not appear in the courthouse. A prosecution witness saw the wife and believed that she was the woman
23  that he had seen with the murderer. In closing argument, the prosecutor commented on the absence of the
wife from the courtroom during the trial. The Supreme Court reversed the conviction. However, significantly,
24  in doing so, the Court reaffirmed the established rule that "even in criminal cases" a negative inference
properly could be drawn from the failure of a party to present available evidence. The Court held that this rule
25  was not controlling in Graves, however, because the wife "was not a competent witness, either in behalf of or
against her husband." 150 U.S. at 120-21, 14 S.Ct. at 41. Graves therefore undercuts, rather than supports,
26  Williams' argument. The Supreme Court reversed not because it was improper to comment upon a
defendant's failure to present evidence but instead because it was unfair to comment upon a failure to
27  present evidence that the defense allegedly could not present. Nor was Graves decided on the basis of any
constitutional principles applicable to the States. Williams' citation to Graves accordingly falls far short of
28  demonstrating that the Nevada Supreme Court's decision in his case was contrary to or an unreasonable
application of clearly established federal law.

-43-

1    the practice in federal criminal trials, and further given that the argument immediately was

2    stricken by the state trial court, petitioner cannot establish a basis for rejecting the Nevada

3    Supreme Court decision on this claim under the governing standard of review.

4        Ground 14 therefore does not provide a basis for federal habeas relief.[40]

5    **Ground 15: Alleged Cumulative Error**

6        In Ground 15, petitioner alleges that he was denied due process due to the "cumulative

7    error of improper conduct by the prosecutor, the reception of inadmissible evidence and

8    erroneous rulings." #9, at 8-AA.

9        On direct appeal, the Supreme Court of Nevada rejected the claim presented to that

10   court on the following grounds:

11           Finally, Williams argues that cumulative error violated his
             constitutional right to a fair trial.  See Pertgen v. State, 110 Nev.
12           554, 566, 875 P.2d 361, 368 (1994).  We disagree.  Any error
             that occurred was minimal and did not prejudice Williams' right to
13           a fair trial. . . . .

14   #23, Ex. G, at 11.

15       The rejection of this claim was neither contrary to nor an unreasonable application of

16   clearly established federal law.

17       Ground 15 does not provide a basis for federal habeas relief.[41]

18       / / / /

19

20       [40]Petitioner further urges in his reply – for the first time in federal court – that this alleged error is
21   further evidence of prejudice supporting his claim that the denial of a severance denied him due process  No
     such legal theory was presented to the Supreme Court of Nevada in support of the claim on direct appeal.
22   See #23, Ex. D, at 22-24.  The Court in any event is not persuaded by this unexhausted legal theory.  Even if
     the Court were to assume, *arguendo*, that later unrelated alleged trial errors had any bearing on the propriety
23   of an earlier denial of a motion for severance, it does not appear that the prosecutor's argument on this point
     gave rise to any federal constitutional error in the first instance.

24
25       [41]The only claim of cumulative error presented to the state courts was presented on direct appeal
     and, necessarily as well as in fact, the cumulative error claim on direct appeal did not include any claim of
26   error based upon alleged ineffective assistance of counsel.  No claim of cumulative error, as to any alleged
     error, was exhausted on state post-conviction review.  Petitioner nonetheless includes an allegation in his
27   federal reply of cumulative error that includes a conclusory allegation as to ineffective assistance of counsel.
     #62, at 8.  The Court rejects this unexhausted claim of cumulative error based upon ineffective assistance of
28   counsel because there has been no demonstration of ineffective assistance that would give rise to
     constitutional-level error, whether alone or in conjunction with other alleged errors.

1      The Court further concludes that a federal evidentiary hearing is not warranted as to

2 any claim herein under 28 U.S.C. § 2254(e)(2).

3      IT THEREFORE IS ORDERED that the petition for a writ of habeas corpus shall be

4 DENIED on the merits and that the petition shall be DISMISSED with prejudice.

5      The Clerk of Court shall enter final judgment accordingly in favor of respondents and

6 against petitioner.

7           DATED: March 18, 2008

8

9

10                                        _____

11                                        ROBERT C. JONES
                                          United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28 (gsk)

-45-